# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MELISSA M. ANDERSON,** | ) | |
| Plaintiff | ) | Civil Action No. 2:22cv00002 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

## *I. Background and Standard of Review*

Plaintiff, Melissa M. Anderson, ("Anderson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Anderson protectively filed applications for DIB and SSI on October 24, 2019, alleging disability as of February 28, 2019, due to dislocated discs and muscle spasms in her lower back; sleep apnea; Hashimoto's disease; chronic pain; depression; and anxiety. (Record, ("R."), at 13, 210-11, 217-23, 248, 279.) The claims were denied initially and on reconsideration. (R. at 129-31, 140-55.) Anderson requested a hearing before an administrative law judge, ("ALJ"). (R. at 156-57.) A hearing was held on April 20, 2021, at which Anderson was represented by counsel. (R. at 34-62.)

By decision dated June 9, 2021, the ALJ denied Anderson's claims. (R. at 13-28.) The ALJ found Anderson meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2023. (R. at 16.) The ALJ found Anderson had not engaged in substantial gainful activity since February 28, 2019, the alleged onset date. (R. at 16.) The ALJ determined Anderson had severe impairments, namely, lumbar spine degenerative disc disease with spinal stenosis and radiculopathy; obesity; major depressive disorder; generalized anxiety; and obstructive sleep apnea, but he found Anderson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.)

The ALJ found Anderson had the residual functional capacity to perform sedentary[1] work, except she could lift and carry items weighing 20 pounds occasionally and 10 pounds frequently; she could stand/walk for two hours and sit for six hours of an eight-hour workday, with an option to sit/stand at will; she could never climb ladders, ropes or scaffolds; she could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl; she could not work around concentrated exposure to cold, vibration or hazards, such as moving machinery and heights; she required a work environment free of fast-paced production work, such as an assembly line; she could perform work involving simple, work-related decisions and few, if any, workplace changes; and she could have occasional interaction with the public. (R. at 21.) The ALJ found Anderson was unable to perform any of her past relevant work. (R. at 26.) Based on Anderson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existing in the national economy that Anderson could perform, including the jobs of an assembler, a packer/stuffer and an inspector. (R. at 26-27, 55-57.) Thus, the ALJ concluded Anderson was not under a disability as defined by the Act, and she was not eligible for SSI and DIB benefits from February 28, 2019, through the date of his decision. (R. at 28.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2021).

After the ALJ issued his decision, Anderson pursued her administrative appeals, (R. at 323-24), but the Appeals Council denied her request for review. (R. at 1-5.) Anderson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§

---

[1] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2021).

404.981, 416.1481 (2021). This case is before this court on Anderson's motion for summary judgment filed June 15, 2022, and the Commissioner's motion for summary judgment filed June 30, 2022.

## II. Facts

Anderson was born in 1984, (R. at 38), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She graduated from high school and cosmetology school and has past relevant work as a kitchen helper, a teacher or childcare attendant, a cashier/stocker and a customer service representative. (R. at 38-41, 54-55, 249.) Anderson testified that her medications caused extreme fatigue and drowsiness. (R. at 45.) She stated she could continuously use her arms and hands up to three minutes due to experiencing numbness and tingling. (R. at 47.) Anderson stated she experienced three to four panic attacks a day. (R. at 49-50.)

In rendering his decision, the ALJ reviewed records from Dr. Andrew Bockner, M.D., a state agency physician; Dr. David Bristow, M.D., a state agency physician; Dr. Richard Surrusco, M.D., a state agency physician; William Carne, Ph.D., a state agency psychologist; The Health Wagon; Mountain States Medical Group, ("Mountain States"); Blue Ridge Neuroscience Center, ("Blue Ridge"); Leigh A. Ford, Ph.D., a licensed psychologist; Appalachia Family Health; Wellmont Medical Associates; and Ballad Health Medical Associates Neurosurgery and Spine, ("BHMA Neurosurgery and Spine").

From October 2018 to October 2019, Anderson sought treatment at The Health Wagon for hypothyroidism and renewal of medications. (R. at 327-32.) An

examination in October 2018 documented no physical examination findings, and Anderson denied feeling down, depressed or hopeless. (R. at 331.)

On February 7, 2019, Anderson established care with Dr. James M. Wilson, M.D., a physician with Mountain States, for low back pain, hypothyroidism and sleep apnea. (R. at 351.) She reported that she could not stand for more than one hour, although she needed to stand a lot for her job at McDonalds. (R. at 351.) She denied anxiety and depression. (R. at 352.) Anderson was alert and fully oriented; she had a normal, positive attitude; she was in no acute distress; and her extremities had no edema. (R. at 353.) Dr. Wilson diagnosed lumbar strain, hypothyroidism and lumbar pain and ordered x-rays of Anderson's lumbar spine, which showed degenerative disc disease at the L4-L5 level. (R. at 350, 353.) On June 25, 2019, an MRI of Anderson's lumbar spine showed multi-level, mild degenerative changes, most pronounced at the L4-L5 level. (R. at 347.)

On September 3, 2019, Anderson was seen by Dr. Mirle R. Girish, M.D., for evaluation of possible obstructive sleep apnea. (R. at 520-22.) Anderson was alert and fully oriented; she had full strength in all extremities; she had normal musculoskeletal range of motion; and she had normal mood, affect, speech, behavior, judgment, thought content, cognition and memory. (R. at 521.) Dr. Girish ordered an all-night polysomnogram study, which showed obstructive sleep apnea syndrome. (R. at 518, 521.) Over the next two months, Anderson underwent evaluation and titration of her continuous positive airway pressure, ("CPAP"). (R. at 514-17, 536-37.) At her follow-up appointments, it was noted that Anderson's obstructive sleep apnea was well-controlled with therapy. (R. at 512, 523, 528, 545.) Anderson's examination findings remained unchanged. (R. at 512.)

On February 26, 2020, Anderson saw Dr. Wilson, reporting back pain. (R. at 372.) Anderson reported weight bearing, back motion, prolonged standing and sitting, bending and straining exacerbated her symptoms. (R. at 372.) Anderson had positive straight leg raising tests, and her extremities had no edema. (R. at 374.) Dr. Wilson diagnosed bilateral L3-L5 radiculopathy and noted her condition was moderate in severity and worsening. (R. at 375.)

On March 10, 2020, Anderson saw Dr. David M. Pryputniewicz, M.D., a physician with Blue Ridge, reporting back and bilateral leg pain. (R. at 360.) Anderson's examination was normal, except she had limited range of motion of her bilateral lower extremities. (R. at 362-63.) Dr. Pryputniewicz diagnosed spinal stenosis of the lumbar region without neurogenic claudication; lumbar spondylosis; low back pain; radiculopathy; and right sacroiliac, ("SI"), joint dysfunction. (R. at 363.) Dr. Pryputniewicz noted Anderson's findings did not require surgical intervention, and he recommended conservative treatment.[2] (R. at 363.)

On May 22, 2020, Leigh A. Ford, Ph.D., a licensed psychologist, evaluated Anderson at the request of Disability Determination Services. (R. at 383-87.) Anderson reported difficulty sleeping due to restlessness and pain. (R. at 384.) She reported she managed grooming tasks independently; she could manage most light household chores, such as light cleaning; she managed the household bills and paperwork; she occasionally went shopping, but always needed someone to go with her, as she would not leave home alone; she enjoyed watching television and

---

[2] Anderson participated in physical therapy from August 11, 2020, through September 17, 2020. (R. at 407-510.) Anderson reported therapy did not provide relief. (R. at 602.) In August 2020, Anderson reported increased pain with movement and pain with all exercises and stretches. (R. at 426, 441, 456.) However, the physical therapist noted that Anderson's "symptoms and movements are not correlating." (R. at 456.) In September 2020, Anderson reported continued pain, but her therapist documented that Anderson had improved ambulation and an even step length. (R. at 471.)

playing games with her children; and she visited with her family. (R. at 384.) Ford reported Anderson's clothing and grooming were appropriate; she was fully oriented; her motor activity was somewhat restless; her facial expressions were somewhat tense, and she cried during the examination; she maintained eye contact; she was cooperative; her affect was variable with a somewhat pessimistic mood; her thought content was appropriate and consistent with her mood; she had normal speech; she did not experience hallucinations or demonstrate any signs of delusional behavior; her organization of thought was logical and goal-oriented, as she was able to remain focused during the examination; she had adequate judgment and good reality testing; she had some gaps in insight regarding her own psychological functioning; she reported difficulty making most decisions; and her coping skills appeared to be "somewhat overwhelmed." (R. at 384-85.)

Ford diagnosed generalized anxiety disorder and unspecified depressive disorder. (R. at 386.) Ford opined Anderson had no limitations in her ability to understand, remember and carry out simple, repetitive tasks; she had slight to moderate limitations on her ability to sustain attention and concentration towards simple, repetitive tasks; and she had moderate limitations on her ability to respond appropriately to supervision, co-workers and work pressures and to tolerate stress and pressure of day-to-day employment. (R. at 386.)

On May 26, 2020, Dr. Andrew Bockner, M.D., a state agency physician completed a Psychiatric Review Technique form, ("PRTF"), finding Anderson had moderate limitations on her ability to understand, remember or apply information, to interact with others and to concentrate, persist or maintain pace and mild limitations in her ability to adapt or manage herself. (R. at 69.) Dr. Bockner noted the record showed Anderson had some signs of anxiety and mild memory deficits. (R. at 69.) He concluded that the overall evidence suggested Anderson was able to

perform simple, routine work with limitations with public interaction. (R. at 69, 75.) On July 23, 2020, William Carne, Ph.D., a state agency psychologist, completed a PRTF, which mirrored that of Dr. Bockner. (R. at 102-03.)

That same day, Dr. Bockner completed a mental assessment, finding Anderson had moderate[3] limitations in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. (R. at 73-75.) Dr. Bockner stated Anderson's work-related mental abilities were, otherwise, not significantly limited. (R. at 73-74.) Dr. Bockner opined Anderson could perform one-to-two step tasks, maintain attention for two hours at a time during the workday and would be limited to frequent interaction with the public. (R. at 74.) He noted he based these findings on Anderson's memory deficits during a consultative evaluation and her inability to repeat digits, which suggested some attention limitations. (R. at 74.) On July 23, 2020, Carne completed a mental assessment, which mirrored that of Dr. Bockner. (R. at 106-08.)

On May 26, 2020, Dr. David Bristow, M.D., a state agency physician, completed a medical assessment, finding Anderson could lift and/or carry 25 pounds occasionally and 25 pounds frequently; sit, stand and/or walk for a total of six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; frequently climb ramps and stairs, balance, stoop, kneel and crouch; and occasionally climb ladders, ropes and scaffolds and crawl. (R. at 71-73.) He

---

[3] The regulations define "moderate limitations" as those resulting in a fair ability to function independently, appropriately, effectively and on a sustained basis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2021).

found Anderson should avoid concentrated exposure to extreme cold, vibration and hazards, such as machinery and heights. (R. at 72.) Dr. Bristow noted no manipulative, visual or communicative limitations. (R. at 72.) In making this residual functional capacity determination, Dr. Bristow considered Anderson's mild degenerative disc disease with reported chronic back pain and noted she maintained gait, strength and sensation. (R. at 72.) On July 22, 2020, Dr. Richard Surrusco, M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. Bristow. (R. at 104-06.)

On June 9, 2020, x-rays of Anderson's chest showed no acute cardiopulmonary disease. (R. at 388.) That same day, x-rays of Anderson's lumbar spine showed multi-level lower lumbar spondylosis and arthrosis with grade one spondylolisthesis of the L5-S1 level. (R. at 390.) On August 20, 2020, and October 1, 2020, Anderson saw Dr. Wilson, reporting anxiety, depression and back pain. (R. at 562, 587.) Anderson reported medication controlled her hypothyroidism, but she continued to have fatigue, depressed mood, loss of interest, weight gain, insomnia and anxiety. (R. at 562, 587.) Anderson reported her depression was worsened by emotional stress and pain. (R. at 562, 588.) Anderson's musculoskeletal system exhibited tenderness, but she had normal range of motion with no deformity or edema; she was fully oriented; and her mood, affect and behavior were normal. (R. at 565.) Dr. Wilson diagnosed hypothyroidism, lumbar pain, lumbar disc degeneration, anxiety, depression and insomnia. (R. at 565-66, 590.)

On August 7, 2020, Anderson saw Crystal Burke, L.C.S.W., a licensed clinical social worker with Appalachia Family Health, upon referral from Dr. Wilson for depression and anxiety. (R. at 395-98.) Anderson reported difficulty coping with pain and stress. (R. at 395.) Anderson's mood was depressed; she had

a sad and tearful affect; she made adequate eye contact; she was fully oriented; her thought process was intact; she exhibited no paranoia or delusions; and her judgment and insight were fair. (R. at 397.) Burke diagnosed major depressive disorder, single episode, severe without psychotic features; anxiety disorder, unspecified; other symptoms and signs involving emotional state; and major depressive disorder, single episode, unspecified. (R. at 396.) On September 10, 2020, Anderson saw Burke and continued to report issues with depression, anxiety and pain management, as well as issues with stress and quality of life issues. (R. at 402.) Anderson reported her medical conditions were overwhelming her daily. (R. at 402.) She reported the added stress of COVID-19 and trying to assist her three sons with virtual learning made her feel like she was about to explode. (R. at 402.) Anderson's examination findings remained unchanged, except her affect was dysphoric. (R. at 399-400.)

On October 21, 2020, Dr. Wilson completed a medical assessment, finding Anderson could occasionally lift and carry items weighing 20 pounds and five pounds frequently; she could stand and/or walk less than two hours in an eight-hour workday and could do so for 30 minutes without interruption; she could sit up to three hours in an eight-hour workday and could do so for up to one hour without interruption; she could occasionally climb and balance and never stoop, kneel, crouch or crawl; she had a limited ability to push/pull; and she would be absent from work more than two days a month. (R. at 751-53.) Dr. Wilson based his findings on Anderson's lumbar disc disease, MRI results and physical examinations. (R. at 751-52.)

On October 23, 2020, Burke completed a mental assessment, finding Anderson had serious limitations, resulting in an unsatisfactory work performance, in her ability to deal with work stresses. (R. at 754-56.) Otherwise, she found

-10-

Anderson had a satisfactory ability to make all other occupational, performance and personal/social adjustments. (R. at 754-55.) Burke opined Anderson would be absent from work more than two days a month. (R. at 756.)

On October 29, 2020, Anderson saw Dr. Wilson, reporting anxiety and knee pain. (R. at 602.) Anderson's musculoskeletal system exhibited tenderness, but she had normal range of motion with no deformity or edema; she had positive straight leg raising tests, left greater than right; she was fully oriented; and her mood, affect and behavior were normal. (R. at 605.) On December 14, 2020, Anderson saw Dr. Wilson, reporting allergic rhinitis, depression and anxiety. (R. at 608.) She stated her depression was worsened by fatigue, job stressors and pain. (R. at 608.)

On November 19, 2020, Anderson saw Bailey E. Qualls, P.A., a physician's assistant with BHMA Neurosurgery and Spine, for back pain, which occasionally radiated into her anterior thighs, and bilateral knee pain. (R. at 554.) Anderson was alert and fully oriented; she had a nonantalgic gait, and she did not use an assistive device; she had limited range of motion, but no tenderness in her lumbar spine and negative straight leg raising tests; she had intact sensation; her reflexes were normal; and she had full motor strength in her lower extremities, bilaterally. (R. at 557.) Qualls diagnosed chronic, bilateral low back pain without sciatica, and she ordered an MRI of Anderson's lumbar spine. (R. at 557.) On January 5, 2021, an MRI of Anderson's lumbar spine showed degenerative Modic endplate changes[4] at multiple lumbar levels, most notable at the L4-L5 level; lateral recess stenosis at the L4-L5 level, right greater than left, likely impinging upon the transiting right L5 spinal nerve; a small cystic lesion, likely a facet joint synovial cyst; unchanged

---

[4] Modic endplate changes are closely related to the normal degenerative process affecting the lumbar spine. *See* https://www.ajnr.org/content/29/5/838 (last visited Mar. 29, 2023).

posterior central annular fissure at the L3-L4 level; and unchanged, mild bilateral foraminal narrowing at the L4-L5 and L5-S1 levels. (R. at 558-59.)

On January 14, 2021, Dr. Wilson noted that Anderson's musculoskeletal system exhibited tenderness, but she had normal range of motion with no deformity or edema; she was fully oriented; and her mood, affect and behavior were normal. (R. at 616-17.)

On February 16, 2021, Anderson saw Erin Douglas, P.A., a physician's assistant with BHMA Neurosurgery and Spine, for low back pain that extended into her bilateral lower extremities. (R. at 757.) Anderson's gait was nonantalgic, and she did not require an assistive device; her lumbar spine had tenderness to palpation at the midline and to the paraspinal musculature, bilaterally, into her posterior hips; she had decreased range of motion; she had negative straight leg raising tests; her sensation was intact; her reflexes were normal; she had full motor strength in her lower extremities, bilaterally; and she was fully oriented. (R. at 760.) Douglas diagnosed chronic low back pain with degenerative disc at the L4-L5 level. (R. at 761.) Conservative treatment, including injections, was encouraged, and Anderson was referred to Pain Management, as surgical intervention was not warranted. (R. at 761.)

On March 2, 2021, Anderson saw Serena E. Blevins, N.P., a nurse practitioner with BHMA Neurosurgery and Spine, for evaluation of back pain that radiated into her lower extremities. (R. at 762.) Anderson's Faber test was positive in both hips; her back had lumbar and SI tenderness; she had limited range of motion; she had normal muscle strength in her lower extremities, bilaterally; she had negative straight leg raising tests; her gait was normal; she was fully oriented; and she had normal mood, affect, behavior, judgment and thought content. (R. at

-12-

766-67.) Blevins diagnosed chronic midline low back pain with bilateral sciatica and SI joint pain. (R. at 767.) An SI joint injection was ordered and administered on March 11, 2021. (R. at 768, 784-85.)

On March 25, 2021, Anderson saw Dr. Wilson, continuing to report anxiety, depression, back pain and some urinary continence symptoms. (R. at 811-12.) Anderson stated she received no significant relief from the spinal injection and reported a decline in functional daily activities secondary to radiculopathy. (R. at 812.) Anderson's musculoskeletal system exhibited tenderness, but she had normal range of motion and no edema; she had spasm of the paraspinal musculature in the lumbar area and point tenderness over the lumbar spine; she had decreased sensation; her deep tendon reflexes were slowed; and she had a normal mood, affect and behavior. (R. at 814.)

That same day, Dr. Wilson completed a medical assessment, finding Anderson could occasionally lift and carry items weighing 20 pounds and five pounds frequently; she could stand and/or walk less than two hours in an eight-hour workday and could do so for less than 30 minutes without interruption; she could sit less than two hours in an eight-hour workday and could do so for less than 20 minutes without interruption; she could occasionally balance and never climb, stoop, kneel, crouch or crawl; she had a limited ability to feel and to push/pull; she was restricted from working arounds heights, moving machinery and vibration; and she would be absent from work more than two days a month. (R. at 808-10.) Dr. Wilson based his findings on Anderson's lumbar disc disease, MRI results and physical examinations. (R. at 808-10.)

Also on March 25, 2021, Dr. Wilson completed a mental assessment, finding Anderson had serious limitations, resulting in an unsatisfactory work performance, in her ability to deal with the public and to maintain attention and concentration. (R. at 805-07.) He found Anderson had no useful ability to deal with work stresses and to understand, remember and carry out complex job instructions. (R. at 805-06.) Otherwise, he found Anderson had either no limitations, a slight limitation or a satisfactory ability to make all other occupational, performance and personal/social adjustments. (R. at 805-06.) Dr. Wilson opined Anderson would be absent from work more than two days a month. (R. at 807.) He based his findings on Anderson's diagnoses of depression and anxiety. (R. at 806-07.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that

the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Anderson argues the ALJ erred by improperly determining her residual functional capacity by rejecting the opinions of Dr. Wilson and Burke. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) More specifically, Anderson argues that these opinions were supported by the record, and had the ALJ adopted them, he would have assessed a different residual functional capacity finding. (Plaintiff's Brief at 5-6.)

Anderson filed her applications in October 2019; thus, 20 C.F.R. §§ 404.1520c, 416.920c govern how the ALJ considered the medical opinions here.[5] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2021). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or

_____

[5] 20 C.F.R. §§ 404.1520c, 416.920c apply to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2021).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2021). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (2021). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (2021). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[6] *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2021). The ALJ found Anderson had the residual functional capacity to perform sedentary

---

[6] An exception to this is when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (2021).

work, except she could lift and carry items weighing 20 pounds occasionally and 10 pounds frequently; she could stand/walk for two hours and sit for six hours of an eight-hour workday, with an option to sit/stand at will; she could never climb ladders, ropes or scaffolds; she could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl; she could not work around concentrated exposure to cold, vibration or hazards, such as moving machinery and heights; she required a work environment free of fast-paced production work, such as an assembly line; she could perform work involving simple, work-related decisions and few, if any workplace changes; and she could have occasional interaction with the public. (R. at 21.)

In making his residual functional capacity finding, the ALJ found Burke's October 2020 assessment unpersuasive, as treatment records showed no significant findings and normal mental status evaluations. (R. at 24-25.) Although the ALJ failed to use the words "supportability" and "consistency" in his analysis, under the new regulatory scheme, the ALJ need not necessarily use the words "supportability" or "consistency," as long as he performs the requisite analysis of these factors. In other words, although the ALJ is not required to follow any particular format in his opinion, whatever format the ALJ chooses must allow a reviewing court to discern an "accurate and logical bridge" from the record evidence to the ALJ's conclusion. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)); *see also* 82 Fed. Reg. 5844-01 at 5858 (the ALJ must comply with a "reasonable articulation standard," which enables "a reviewing court to trace the path of an adjudicator's reasoning, and will not impede a reviewer's ability to review a determination or decision, or a court's ability to review [the ALJ's] final decision."). I find that, despite the brevity of the ALJ's analysis of Burke's opinion, the court can,

nonetheless "trace the path" of his reasoning, and a meaningful review is not frustrated.

I further find that the evidence cited by the ALJ supports a finding that Burke's opinion is not supported by her own treatment notes, which show Burke saw Anderson on two occasions, and her treatment notes indicated that, although Anderson had a depressed or sad mood and dysphoric affect, she was fully oriented, had adequate eye contact, no paranoia or delusions, intact thought process and fair insight and judgment. It is noted that Burke failed to explain her reasoning supporting her opinion that Anderson had serious limitations in her ability to deal with work stresses and that she would be absent from work more than two days a month. I, likewise, find Burke's treatment notes support a finding that her opinion is not consistent with the other evidence of record, which also reflect normal mental status examinations. Thus, it appears the ALJ considered the consistency factor by stating treatment notes and primary care related mental status findings indicated no significant findings and normal mental status evaluations. (R. at 24-25, citing Exs. 2F, 4F, 7F, 12F and 13F.)[7]

Similarly, the ALJ found Dr. Wilson's mental assessment not persuasive, as his notes reflect Anderson's mental status examination findings generally were normal. (R. at 25.) In addition, the ALJ noted that Dr. Wilson cited no specific findings in the objective record to support the assessed social, performance and occupational limitations. (R. at 25.) In support of his mental assessment, Dr. Wilson stated Anderson had been diagnosed with depression and anxiety for three years, which required medical therapy, but he did not reference any examination findings or objective evidence to support his opinion. *See Gross v. Heckler*, 785

---

[7] Exhibits 2F, 4F and 12F contain treatment records from Dr. Wilson. Exhibits 7F and 13F contain treatment records from Burke.

F.2d 1163, 1166 (4th Cir. 1986) (a mere diagnosis is not enough to prove disability; rather, "[t]here must be a showing of related functional loss."). In evaluating the supportability factor, the ALJ considered that, on mental status examination, Dr. Wilson's treatment notes routinely showed Anderson was fully oriented; she had a positive attitude; she had intact insight and judgment; and she had normal thought content, mood, affect and behavior. (R. at 22-23.)

In addition, the ALJ considered the consistency factor by finding Anderson generally had normal mental status findings throughout treatment. (R. at 25.) The record shows that Anderson's other health care providers found that she was fully oriented, and her mood, affect, behavior, judgment and thought content were normal. The record shows that, although Ford reported Anderson's motor activity was somewhat restless, and her affect was variable with a pessimistic mood, she maintained eye contact; she was cooperative; her thought content was appropriate and consistent with her mood; she had normal speech; she did not experience hallucinations or demonstrate any signs of delusional behavior; her organization of thought was logical and goal-oriented, as she was able to remain focused during the examination; and she had adequate judgment and good reality testing. The ALJ found Ford's restrictions on attention, concentration, interaction and adaptation were not supported by objective findings, including Ford's consultative examination and the treatment record. (R. at 25.) As noted by the ALJ, Anderson reported she was able to perform normal daily activities; she assisted her three sons with virtual learning during COVID; she watched television and played games with her children; she managed the household chores and paperwork; and she visited her family. Again, the ALJ considered both the supportability and consistency factors as to Dr. Wilson's and Ford's opinions. Based on this, I find the ALJ properly considered the consistency and supportability factors in evaluating the assessments of Burke, Dr. Wilson and Ford.

The ALJ found Dr. Wilson's physical assessment less persuasive, as the radiological evidence and objective physical evidence did not support the severity of the restrictions he placed on Anderson. (R. at 25.) Dr. Wilson found Anderson was acutely restricted in lifting, carrying, standing, walking, sitting, reaching and performing postural functions due to the severity of musculoskeletal pain and symptoms related to lumbar disc disease. (R. at 25.) With respect to supportability, the ALJ noted that Dr. Wilson's treatment notes showed that Anderson's neurological examinations were unremarkable, with no sensory or motor deficits, and despite any complaints of tenderness, Anderson had normal range of motion and no edema or deformity. (R. at 22-23, 26.)

With respect to consistency, the ALJ recognized throughout the decision that the objective physical evidence of record from other providers was inconsistent with Dr. Wilson's opinion. (R. at 25.) While Anderson had some positive findings, such as tenderness and reduced range of motion, other findings, such as Anderson's gait and station, straight leg raising tests and reflexes, generally were normal. (R. at 23, 26.) In addition, the ALJ noted that, despite testing positive on the FABER and Fortin tests,[8] Anderson had normal strength, reflexes, gait and ambulation. (R. at 22.) The ALJ also considered the diagnostic tests in determining that the evidence from other providers was not consistent with Dr. Wilson's opinions. (R. at 25.) Conservative treatment was recommended, as surgical intervention was not needed. Based on this, I find the ALJ properly considered the consistency and supportability factors in evaluating Dr. Wilson's physical assessment.

---

[8] These tests are used to assess SI joint pathology or dysfunction. *See* https://www.mskmedicine.com/clinical_skills/faber-test (last visited Apr. 12, 2023); *see also* https://www.now.aapmr.org/si-joint-pain/ (last visited Apr. 12, 2023).

Based on the above, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's consideration of the medical evidence;

2.  Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.  Substantial evidence exists in the record to support the Commissioner's finding that Anderson was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Anderson's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed

findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     April 12, 2023.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE